## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

WILLIAM MORRISSETTE, III, an individual,

                Plaintiff,

                                        No. 2:11-cv-14554

vs.                                    Hon. Gerald E. Rosen

PATRICK R. DONAHOE, Postmaster
General of the United States.

                Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Plaintiff William Morrissette III, acting *pro se*, filed a Complaint on October 17, 2011 asserting a wide variety of claims arising out of his employment with and subsequent termination from the United States Postal Service (USPS). Defendant, the Postmaster General of the United States, has moved for Summary Judgment. Having reviewed and considered the parties' briefs and supporting documents and the entire record of this matter, the Court has determined that the pertinent allegations and legal arguments are sufficiently addressed in these materials and that oral argument would not assist in the resolution of this motion. Accordingly,

the Court will decide Defendant's motion "on the briefs." See L.R. 7.1(f)(2). This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

### A.    Plaintiff's employment with the United States Postal Service

Plaintiff is a former USPS employee who worked at the College Park Station in Detroit as a City Letter Carrier.  (Def's Ex. 1, Dkt. # 15-2, at 2).  At some unspecified time in 2007 and 2008, Plaintiff engaged in several unknown acts of protected activity.[1]  This litigation centers on Plaintiff's allegation that his former supervisors and managers took issue with this protected activity and subsequently engaged in six discrete categories of retaliatory conduct in 2009, ultimately culminating with his removal from the USPS at the end of 2009.  These six acts are set forth in chronological order below.

---

[1] Such activity, however well-known to the parties, is not reflected in the record before this Court.  It is not apparent, for example, what activity Plaintiff engaged in, when, and its resolution.  While Defendant's Brief provides a multitude of different dates and resolutions in its papers (*see, e.g.,* Def's Ex. A, Dkt. # 15-20, ¶ 18), these are not reflected in the record.  As far as the Court can discern, the latest date Plaintiff asserts he engaged in protected activity unrelated to the complaints lodged at issue in this current litigation is September 26, 2008.  (Def's Ex. 12, Dkt. # 15-13, at 19).  Because Defendant does not dispute that Plaintiff engaged in protected activity, this is not an issue.  The Court, however, cautions Defendant to be more thorough in its submissions in the future with respect to presenting material facts not in dispute because it is not up to a district court to "search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989); *Emerson v. Novartis Pharmaceuticals Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) ("Judges are not like pigs, hunting for truffles that might be buried in the record.") (alterations and citations omitted).

2

**1.      Acts of Aggressive and Threatening Behavior in March 2009**

Plaintiff complains about two independent incidents in March 2009 involving two separate management employees, both of whom had knowledge of Plaintiff's prior protected activity. (Def's Ex. 13, Dkt. # 15-14, at 8, 35-36). First, Plaintiff points to a March 10, 2009 incident with his former manager, Cheryl Lewis. On this date, Plaintiff and one of his supervisors -- Sean Hickombottom -- were getting papers off the fax machine. (Def's Ex. 2, Dkt. # 15-3, at 14; *see also* Def's Ex. 12, Dkt. # 15-13, at 19-21). Lewis came in from another office, approaching Plaintiff in a "physical [and] intimidating manner." (Def's Ex. 2, Dkt. # 15-3, at 14). Lewis testified, and Plaintiff did not dispute, that she was concerned that Plaintiff was on the clock during this time when he should not have been and instructed him to clock out. (Def's Ex. 13, Dkt. # 15-14, at 8-9). According to Plaintiff, Lewis then "snatched some stuff out [of his] hands and was in [his] face." (Def's Ex. 2, Dkt. # 15-3, at 15). Plaintiff responded by letting her know that she should not "be in [his] face." (*Id.*). He also told her "never to run up on [him] ever again in [her] life as long as [he's] a man and [he's] black," and that he was "only going to say [that] once." (*Id.* at 68). Hickombottom stepped in between the two and Plaintiff left the building. (*Id.*). Plaintiff was not disciplined for this incident. (*Id.*).

Second, Plaintiff points to a March 19, 2009 incident involving one of his two direct supervisors, Willie Greggs.  On that day, another supervisor -- though not Plaintiff's at the time -- conducted a street observation of Plaintiff's delivery route.  (*Id.* at 68-69).  After the street observation, Plaintiff returned to the College Park Station *without* having completed his route.  (*Id.* at 72).  Greggs instructed Plaintiff to either finish his route or fill out a request for leave, but advised that he was not going to approve vacation leave.  (*Id.* at 70-71).  Plaintiff chose the latter and filled out a leave request for 5.75 vacation hours -- the remainder of the day.  (*Id.* at 71-72).  While filling out this form, Greggs "came to [him] and spoke in a condescending and loud manner."  (*Id.* at 16.).  Plaintiff then stepped towards Greggs, Greggs stepped away, and Plaintiff asked Greggs if he was "trying to engage [him] physically."  (*Id.* at 16; Def's Ex. 13, Dkt. # 15-14, at 69-70).  Greggs replied, stating "if I were engaging you physically you would know about it." (Def's Ex. 2, Dkt. # 15-3. at 16).  Plaintiff interpreted this as a threat.  (*Id.*).

### 2.    May 12, 2009 Denial of FMLA

On May 12, 2009, Plaintiff submitted a request to take leave under the Family and Medical Leave Act (FMLA) to cover an April 2009 absence when he was hospitalized.  (*Id.* at 17-20, 74-75, 209-10).  Tamara Connelly-Myrick, Defendant's FMLA Coordinator for the College Park Station, processed Plaintiff's request by asking that Plaintiff provide more information to determine whether his

4

request could be approved and provided him with a Designation Notice indicating the following: "Admission & discharge papers required. Medical information regarding condition and dates of incapacity required." (*Id.* at 17-18; Def's Ex. 6, Dkt. # 15-7, at 5). Plaintiff did not do this and instead just provided a record showing an emergency room visit. (Def's Ex. 2, Dkt. # 15-3, at 18, 212-14). Accordingly, Myrick denied Plaintiff's request. (*Id.* at 212-14). Plaintiff believes that Myrick did this to "throw obstacles and hurdles in the way of getting approved for FMLA," asserting that he "believes" Lewis told Myrick to do this because he engaged in protected activity. (Def's Ex. 2, Dkt. # 15-3, at 19; Def's Ex. 1, Dkt. # 15-2, at 9). He also claims that because Myrick works for the USPS, she is not objective and therefore makes decisions based only to protect USPS's best interests. (Def's Ex. 2, Dkt. # 15-3, at 20). Despite this assertion, he admits that Myrick had no knowledge of his prior protected activity when she denied Plaintiff's request.[2] (*Id.* at 24-25).

_____

[2] In addition, Plaintiff also testified that Myrick set up another "hurdle" by requesting a second medical opinion for a serious health condition unrelated to his May 12, 2009 request. (Def's Ex. 2, Dkt. # 15-3, at 18-19; Def's Ex. 6, Dkt. # 15-7, at 5). He contends that Myrick was "not in a position of having a medical background or knowledge . . . to question the opinion of a certified physician." (Def's Ex. 2, Dkt. # 15-3, at 18). The second opinion found that he was entitled to leave for intermittent absences of 1 to 2 days per month, but Plaintiff did not accept this. (*Id.* at 215-16; Def's Ex. 6, Dkt. # 15-7, at 7). Myrick gave Plaintiff the opportunity to provide input into selecting a physician for a third exam, but Plaintiff never provided Myrick with any names. (Def's Ex. 2, Dkt. # 15-3, at 217). Nevertheless, Plaintiff was ultimately approved for this leave and actually

5

### 3.      Alterations of "Clock Rings" on Unspecified Dates

Defendant uses a "badge reader" system that allows employees to electronically punch in and out when performing different operations and functions.  (*Id.* at 21).  According to Plaintiff, Defendant had a regular practice of altering his "clock rings" to reflect the time that management "felt" Plaintiff worked on a given day -- i.e., reducing the number of hours he worked.  (*Id.*).  This was apparently an issue that was subject to a prior settlement agreement, resulting in Defendant adjusting Plaintiff's pay.  (*Id.* at 20, 75-76; *see also* Def's Ex. 13, Dkt. # 15-14, at 12; Def's Ex. 15, Dkt. # 15-16).  Under Defendant's policy, management employees may alter clock rings if an employee improperly punches in or out or if they observe employees who are on the clock but not working.  (Def's Ex. 13, Dkt. # 15-14, at 12-13, 18-19, 44-45).  Both Lewis and Gregg admitted to altering Plaintiff's clock rings to adjust for instances where Plaintiff should not have been on the clock -- like sitting at his case, in the bathroom, or otherwise not working.  (*Id.* at 20-22, 44-45).  Plaintiff cannot, however, identify any specific dates in 2009 when this occurred, and there is no record evidence indicating that these alterations were done for any reason other than to correct his time records to reflect time he was actually working.  (Def's Ex. 2, Dkt. # 15-3, at 21-24).  He was also given an opportunity in mid-2009 to provide dates of alleged

---

received over 760 hours -- 280 hours more than the 480 hours to which he was entitled per year -- of approved FMLA leave in 2009.  (*Id.* at 72).

6

improper alterations to Stephanie Brantley, another one of his supervisors, for her to review and to verify his clock rings -- he never did. (Def's Ex. 13, Dkt. # 15-14, at 97). Finally, there is no evidence linking these unspecified clock rings to his prior protected activity other than the fact that altering Plaintiff's clock rings was part of his prior protected activity.

### 4. Bypassing Plaintiff for Overtime Opportunities on Unspecified Occasions

Next, Plaintiff asserts that Defendant retaliated against him by not giving him overtime opportunities. (Def's Ex. 2, Dkt. # 15-3, at 23-25). Similar to the "clock rings" allegation, this was apparently the subject of a prior settlement agreement between the parties. (*Id.* at 23-24). Plaintiff's supervisors and managers told him that they would not give him overtime "based on the fact that [his] route was not getting completed by [him] in eight hours and that they could not give anyone who couldn't complete their route overtime." (*Id.* at 24; Def's Ex. 13, Dkt. # 15-14, at 46). There is no dispute that Plaintiff took longer -- often more than eight hours -- to complete his route. Plaintiff's explanation for this is that his route was "out of adjustment," meaning that the route's workload was such that it required more than eight hours to complete. (*See, e.g.,* Def's Ex. 2, Dkt. 15-3, at 80). He does not identify any specific dates in 2009 where he was bypassed for overtime opportunities and there are again no facts linking this allegation to

7

Plaintiff's prior protected activity other than overtime scheduling was the subject of a prior settlement agreement.

To the issue of adjustment, the record is clear that other carriers were able to complete his route within the projected time, without any assistance, and therefore were not precluded from receiving overtime opportunities. (*Id.* at 84-92; Def's Ex. 13, Dkt. # 15-14, at 74; Def's Ex. 16, Dkt. # 15-17). For example, on November 23, 2009, another carrier delivered Plaintiff's route. (Def's Ex. 2, Dkt. # 15-3, at 91-92). She delivered 1792 pieces of mail, spending only 48 minutes in the office and 6 hours and 22 minutes delivering mail, all without assistance from other carriers. (*Id.*). On the very next day, Plaintiff spent 4 hours and 17 minutes in the office and 3 hours and 31 minutes delivering close to *half* of the prior day's volume -- 1095 items -- and still required an additional 6 hours and 16 minutes of assistance from other carriers. (*Id.*). Indeed, Plaintiff's route was inspected before and after his removal -- both inspections concluded that it should take fewer than eight hours to complete.[3] (*Id.* at 115-17).

### 5.    October 21, 2009 Emergency Placement

On October 21, 2009, Plaintiff claims that three hours into his shift, "[s]upervision" told him to "leave the building" because they were "placing [him]

---

[3] Plaintiff's supervisor observed Plaintiff engaging in time-wasting tactics, perhaps explaining why Plaintiff regularly took longer to complete his route: "[H]e would do baby steps. Every driveway he'd get to he'd look left and right [to] make sure no cars is (sic) coming." (Def's Ex. 2, Dkt. # 15-3, at 254-55).

8

on emergency placement." (*Id.* at 25-26.)  Plaintiff asserts that he was not initially told why he was removed from work that day and claims that Defendant "concocted an emergency placement letter" that was given to him the next day. (*Id.* at 26-27).  This letter -- authored by his then-supervisor Aquanetta Littleton, who was not aware of Plaintiff's prior protected activity -- stated the following:

> Based on your conduct displayed on the workroom floor and your blatant refusal to follow your Supervisor's instructions, there was a reason to believe that retaining you on duty might have resulted in an unfavorable effect on the Postal Service.  In addition, when Management requested you to relinquish your employee identification badge, your employee time card, and vehicle keys you refused and left the premises with these items in your possession.

(Def's Ex. 5, Dkt. # 15-6, at 1, 30; Def's Ex. 13, Dkt. # 15-14, at 136-41). Plaintiff's behavior caused other employees to become "more engaged in what was going on [with Plaintiff] than being productive in the office."  (Def's Ex. 13, Dkt. # 15-14, at 101-02).  Though he returned to work the next day, Plaintiff takes issue with the fact that he has not received pay for the time he missed despite an agreement with Defendant and Plaintiff's Union to the contrary.  (Def's Ex. 2, Dkt. # 15-3, at 27).

### 6.     Removal From The USPS

Lastly, Plaintiff asserts that Defendant retaliated against him by removing him from the Postal Service on December 29, 2009.  (*Id.* at 27-31).  On this date, the USPS notified Plaintiff that he was being "removed" from the Postal Service

for two job-performance reasons: (1) failing to follow instructions and discharge his duties; and (2) failing to make "MSP" scans. (Def's Ex. 5, Dkt. # 15-6, at 5-10).[4] Littleton issued this letter, with input from others -- Greggs, Brantley, and an unidentified labor relations representative -- in gathering information and drafting its wording. (Def's Ex. 13, Dkt. 15-14, at 47, 60-61, 148).

First, Plaintiff failed to follow instructions and discharge his duties as assigned -- he spent too much time on his route (which then required assistance from other carriers to complete), failed to return to the College Park Station when requested, and took his breaks at inappropriate times. (Def's Ex. 5, Dkt. # 15-6, at 5-7). For example, on December 3, 2009, Plaintiff's route should have taken just over 8 hours, but Plaintiff took close to 14 and did not even complete it -- requiring close to 6 more hours of assistance from other carriers. (*Id.* at 5-6). As one of his supervisors put it: "[E]ach day with that assignment it took nine and a half hours or better, to sometimes close to 12 hours a day to get that assignment delivered when [Plaintiff] was on the route. When he's not on the route, there's an eight-hour assignment or less." (Def's Ex. 13, Dkt. # 15-14, at 104). The removal letter also references several other times where Plaintiff's route hours varied greatly from route projections. (Def's Ex. 5, Dkt. # 15-6, at 6-7). Plaintiff does not dispute that

---

[4] Defendant also took parts of Plaintiff's past disciplinary record into account, including prior no-time off suspensions in October and November 2009 for being AWOL, deviating from his route, and failing to make MSP scans. (Def's Ex. 5, Dkt. # 15-6, at 10; *see also id.* at 20-21, 31-34).

10

he took longer to complete his route, and as referenced above, just responds that his route was never adjusted.  (Def's Ex. 2, Dkt. # 15-3, at 79-81).

Second, Plaintiff failed to make required "MSP" scans -- scanning barcodes at the station and along a carrier's line of travel, which tracks a carrier's office and street performance.  (Def's Ex. 5, Dkt. # 15-6, at 8).  From November 25, 2009 through December 3, 2009, Plaintiff had a possible total of three scans per day in the office (fifteen total office scans) and a possible total of seven scans per day on the street (totaling thirty-five street scans).  (*Id.*; Def's Ex. 18, Dkt. # 15-19).  He missed all of these fifty opportunities.  (*Id.*).  Plaintiff admits that his supervisors instructed him to make these scans, but that he just did not do so.  (Def's Ex. 2, Dkt. # 15-3, at 79-81).

## B.    Procedural history

Plaintiff filed documents with the USPS after most of these incidents requesting an appointment with a USPS Dispute Resolution Specialist (commonly referred to as "Pre-Complaint Counseling") asserting that these incidents were in retaliation for his prior protected activity.  (*See, e.g,* Def's Ex. 12, Dkt. # 15-13, at 9-21, 23-26).  He filed a formal EEOC Complaint of Discrimination on October 30, 2009, asserting claims of retaliation against Myrick, Greggs, and Lewis:  "I was approached in a physical manner by Cheryl Lewis.  I was treated disparately by management and supervision.  My request for FMLA was sent through

11

unnecessary hurdles and denied with no real basis.  My clock rings have been fraudulently altered."  (Def's Ex. 8, Dkt. # 15-9, at 1).  Defendant acknowledged this complaint and, consolidating issues, noted that Plaintiff alleged ongoing retaliation "since on or about March 2009" in the following ways: "approached in an aggressive manner; FMLA request denied; clock rings were altered; by-passed the opportunity to work overtime; and has been removed from service."  (Def's Ex. 9, Dkt. # 15-10).

On April 4, 2010, Plaintiff requested a hearing on his formal complaint before an EEOC Administrative Law Judge.  (Def's Ex. 10, Dkt. # 15-11).  After two full days of hearing in November 2010 (Def's Ex. 2, Dkt. # 15-3; Def's Ex. 13, Dkt. # 15-14), EEOC Administrative Law Judge Mimi M. Gendreau issued a decision on July 19, 2011 making certain factual findings and concluding that Defendant did not retaliate against Plaintiff for the above issues.  (Def's Ex. 11, Dkt. # 15-12).  Plaintiff filed this instant lawsuit shortly thereafter.  Contrary to Defendant's assertion, Plaintiff's lawsuit is not an "appeal" of this determination. (Def's Br., Dkt. # 15, at 1).  Rather, this Court reviews Plaintiff's claims *de novo* because Plaintiff has now filed this litigation pursuant to 42 U.S.C. § 2000e-16(c).

## C.   Plaintiff's Complaint

Plaintiff's Complaint asserts a myriad of employment-related claims.  His one-page handwritten complaint makes the following allegations:

I am suing my former employer for damages related to wrongful termination, harassment, discrimination, intimidation, unpaid wages, violation of FMLA related statutes, unfair labor practices, medical/disability discrimination, breach of contract (previous EEOC settlement agreements), subjection to stress and duress, intentional infliction of emotional distress, mental anguish, financial destabilization, etc. The employer violated laws by fraudulently misrepresenting/tampering with clock rings. I was also violated in regards to being penalized for FMLA protected leave. I was subjected to constant harassment and discrimination. My dismissal violated terms of the national agreement between management and the union. Several previous EEOC settlements had (sic) been breached. All attempts to rectify these matters were met with unnecessary hurdles and obstacles as well as aggression. The time for crying and sorrow has passed; what's right is right and what's wrong is wrong.

(Plf's Complaint, Dkt. # 1).

## III. DISCUSSION

### A.    Rule 56 Standard

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). In addition, where a moving party -- here, Defendant -- seeks an award of summary judgment in its

13

favor on a claim or issue as to which it bears the burden of proof at trial, this party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). But, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

Although Plaintiff did not substantively respond to Defendant's Motion for Summary Judgment,[5] such a failure is not the end of this Court's inquiry. The

---

[5] In response, Plaintiff asks that the Court infer a factual dispute because Defendant allegedly did not produce certain documents during discovery and therefore "all the relevant facts are not on the table." (Plf's Resp., Dkt. # 20, at 1-2). Plaintiff neither provided any information regarding these certain documents nor put forth any other additional facts into the record. *See, e.g., Emswiler v. CSX Trans., Inc.*, 691 F.3d 782, 788 (6th Cir. 2012) ("Defendant[] bear[s] the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of [Plaintiff]'s claims. Plaintiff must then present sufficient evidence from which a jury could reasonably find in his favor.") (citing *Celotex*, 477 U.S. at 323). To the

14

Sixth Circuit has held that a party's failure to respond to an opponent's motion for summary judgment should not by itself warrant a grant of summary judgment. *Carver v. Bunch,* 946 F.2d 451 (6th Cir. 1991). The *Carver* panel stated:

> As the Supreme Court has repeatedly held, "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." Additionally, under Rule 56(c) a party moving for summary judgment always bears the burden of demonstrating the absence of a genuine issue as to a material fact . . . . Although subsequent Supreme Court cases have redefined the movant's initial burden . . . the requirement that the movant bears the initial burden has remained unaltered. More importantly for all purposes, the movant must always bear this initial burden regardless if an adverse party fails to respond. In other words, a district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded. The court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged that burden.

*Id.* at 454-55 (citations omitted).

## B.   Plaintiff's Retaliation Claim

Title VII contains "a potent anti-retaliation provision." *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013). The Supreme Court has emphasized that "[c]ontext matters" when examining retaliation claims: "[T]he significance of any given act of retaliation will often depend upon the particular circumstances. . . . 'The real social impact of workplace behavior often depends on a constellation of

---

extent Plaintiff is referring to those documents that were the subject of Plaintiff's Motion to Compel (Dkt. #19), this Court has already addressed the merits of that Motion. (Dkt. # 23).

surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006) (citation omitted). Accordingly, an "employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 56.

Like a Title VII anti-discrimination claim, a plaintiff may establish a retaliation claim through direct or indirect evidence. *Fuhr*, 710 F.3d at 673. Direct evidence "*requires* the conclusion that unlawful retaliation was a motivating factor in the employer's action." *Id.* (citing *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003). Absent direct evidence, a plaintiff may establish indirect evidence through the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green.*, 411 U.S. 792 (1973). *Id.* at 674.

There is not any direct evidence of retaliation in the record and as such,[6] this Court will examine whether Plaintiff can establish indirect evidence of retaliation.

---

[6] Plaintiff testified that at some unidentified date, Lewis told him that he "was the reason for holding her up . . . from a different position because [he] was engaging in . . . EEO activity." (Def's Ex. 2, Dkt. # 15-3, at 32). This non-specific and ambiguous statement does not indicate discriminatory intent and was not made by someone with managerial authority over any of the challenged personnel decisions at issue in this case -- Lewis was off work from June 1, 2009 until after Plaintiff's removal. (Def's Ex. 13, Dkt. # 15-14, at 27). It is therefore a "stray remark" and not relevant. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998). Plaintiff also testified that "other individual witnesses" told Plaintiff

To establish a prima facie case of retaliation under Title VII, Plaintiff must prove that "(1) [he] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment." *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 995-96 (6th Cir. 2009) (citation omitted).

If Plaintiff establishes a prima facie case, "the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Id.* (citation omitted).  Upon such a showing, Plaintiff must then demonstrate "that the proffered reason[s] w[ere] not [Defendant's] true reason[s] but merely a pretext for retaliation." *Harris v. Metro. Gov't of Nashville and Davidson Cnty., Tenn.*, 594 F.3d 476, 485 (6th Cir. 2010).  Plaintiff may do so "by demonstrating  that the proffered reasons (1) had no basis in fact, (2) did not actually motivate the employer's action, or (3) were insufficient to motivate the

that Lewis and Greggs made comments to the effect that their "ultimate goal is to get rid of this guy." (Def's Ex. 2, Dkt. # 15-3, at 32).  Plaintiff may not offer this statement for the truth of the matter asserted in opposition to Defendant's Motion for Summary Judgment because "[a] court cannot rely on unsworn inadmissible hearsay when ruling on a summary judgment motion." *Hoover v. Walsh*, 682 F.3d 481, 491 n. 34 (6th Cir. 2012).  Even if it were not hearsay, it is an ambiguous statement and is therefore a stray remark -- it does not tie their alleged desire to "get rid of him" to his prior protected activity. *Ercegovich*, 154 F.3d at 354.

employer's action." *Id.* Finally, a proffered reason cannot be pretextual "unless it is shown *both* that the reason was false, *and* that [retaliation] was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993). As the Supreme Court recently explained, Plaintiff "must establish that his . . . protected activity was a but-for cause of the alleged adverse action[s] by the [USPS]." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013).

Because it is undisputed that Plaintiff engaged in activity protected by Title VII, the Court examines, in turn, the remainder of the prima facie elements for each alleged act of retaliation: (1) Acts of aggressive and threatening behavior in March 2009 by Lewis and Greggs; (2) The May 12, 2009 denial of his FMLA request; (3) Altering his "clock rings" on unspecified dates; (4) Bypassing him for overtime opportunities on unspecified occasions; (5) Placing him on "emergency placement" on October 21, 2009; and (6) Removing him from service on December 29, 2009.

### 1.    Acts of Aggressive and Threatening Behavior in March 2009

Plaintiff's assertion that Lewis and Greggs retaliated against him based on their March 2009 behavior fails as a matter of law. First, according to Plaintiff, Lewis approached him aggressively on March 10, 2009, "snatched some stuff out [of his] hands and was in his face" and had "an intimidating stance." He also admits that in response, he told Lewis "never to run up on [him] ever again in [his]

18

life as long as [he's] a man and [he's] black" and that he was "only going to say [that] once." Second, on March 19, 2009, Greggs "came to [him] and spoke in a condescending and loud manner." Plaintiff stepped towards Greggs, asked if Greggs was "trying to engage [him] physically," to which Greggs responded: "if I were engaging you physically you would know about it."

These isolated incidents are not sufficient to establish that USPS took an adverse employment action against Plaintiff, or that Plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor. No reasonable jury would find these allegedly retaliatory acts so adverse that they would dissuade a reasonable employee from making a charge of discrimination, especially given Plaintiff's own aggressive and threatening conduct. At most, these incidents -- taken in Plaintiff's best light -- reflect two discourteous isolated work incidents that did not affect his employment. *See, e.g., Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80 (1998) (Title VII is not a "general civility code for the American workplace"). Plaintiff was not disciplined for, nor did significantly different job responsibilities result from, these incidents. *Hunter*, 565 F.3d at 996-67; *Ceckitti v. City of Columbus, Dep't of Pub. Safety, Div. of Police*, 14 F. App'x 512, 516 (6th Cir. 2001) ("To establish that an employer's conduct constitutes severe or pervasive retaliatory harassment, the plaintiff must show that 'the workplace is permeated with discrimination, intimidation, ridicule, and insult that

is sufficiently severe or pervasive to alter the conditions of the victim's employment . . .'") (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)); *cf Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) ("'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'") (citing *Oncale*, 523 U.S. at 81).

Even assuming such acts did constitute adverse action or severe or pervasive retaliatory harassment, there is no record evidence establishing a causal link between these acts and Plaintiff's protected activity.  Plaintiff's burden at the prima facie stage, though minimal, requires him to "put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity." *A.C. ex rel J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 699 (6th Cir. 2013).  "While temporal proximity between an assertion of Title VII rights and an adverse employment action provides highly probative evidence of a causal connection, 'temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence.'" *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008) (two-month gap between protected activity and adverse action, without other evidence of retaliation, is not enough to establish a causal connection); *see also Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) (gap of at least eight months plus Plaintiff's bad

20

behavior leading to discipline was insufficient to permit an inference of retaliatory motive).  Plaintiff has put forth no such evidence that these March 2009 events permit an inference of retaliatory discrimination and Plaintiff's claim therefore fails.

### 2.    May 12, 2009 Denial of FMLA

Plaintiff cannot establish a prima facie case with respect to this claim.  He admits that Myrick -- the person responsible for denying his FMLA claim and for pursuing a second medical opinion -- was not aware that he had previously engaged in protected activity when she made these adverse decisions.  This admission is fatal as he cannot establish the second element of a prima facie case for retaliation -- knowledge.  And, even if she were aware, there is no factual record indicating these decisions were causally connected to his protected activity. The FMLA does not require that an employer "simply accept an employee's say-so that he needs and has taken FMLA leave on a particular date."  *Manns v. ArvinMeritor, Inc.*, 291 F. Supp. 2d. 655, 661-62 (N.D. Ohio 2003).  Rather, it expressly permits employers to verify whether leave is actually FMLA-qualifying or not.  *See, e.g.,* 29 U.S.C. § 2613(a) ("An employer may require that a request for leave . . . be supported by certification issued by the health care provider of the eligible employee").  Certification is sufficient when, among other things, it states "the probable duration of the condition."   § 2613(b)(2).   Here, Plaintiff's

submissions did not provide this information and Myrick denied his request accordingly. Given Plaintiff's inability to submit complete paperwork, there is no causal connection here. *Hunter*, 565 F.3d at 996; *Vereecke*, 609 F.3d at 401.

### 3. Alterations of "Clock Rings" on Unspecified Dates

This claim fails as well. There is no record evidence indicating Defendant *impermissibly* changed his clock rings on any specific dates in 2009 and as such, Plaintiff cannot meet the third prong of the prima facie test -- adverse action. And, even if he could, there is no record evidence causally connecting this claim to his prior protected activity. *Id.*

### 4. Bypassing Plaintiff for Overtime Opportunities on Unspecified Occasions

For the same reason Plaintiff's clock ring claim fails, so too does his allegation that Defendant retaliated against him for not offering him overtime opportunities. There is no record evidence indicating when Defendant denied him overtime opportunities to which he was entitled in 2009 and there is no evidence deducing a causal connection. *Id.*

### 5. October 21, 2009 Emergency Placement

Summary judgment is also appropriate on this claim. The Sixth Circuit has not examined whether a one-day -- or less -- suspension without pay is a materially adverse action, meaning it would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68. Courts across

the country have come to different conclusions on this issue.  *See, e.g., Martinez v. Connecticut, State Lib.*, 817 F. Supp. 2d 28, 40-41 (D. Conn. 2011) (collecting cases); *see also LeMaire v. Louisiana Dep't of Transp. and Dev.*, 480 F.3d 383, 390 (5th Cir. 2007) (two-day suspension without pay is a materially adverse action).  This Court need not resolve this however, because even assuming the half-day unpaid suspension on October 21, 2009 is a materially adverse action, there is no record evidence linking this action to Plaintiff's protected activity. *Hunter*, 565 F.3d at 996; *Vereecke*, 609 F.3d at 401.

### 6.    Removal From The USPS

As with all of Plaintiff's other claims, Plaintiff has not put forth a prima facie case relating to his removal from the Postal Service.  Given the distance in time between Plaintiff's past protected activity and his December removal, as well his admissions that others completed his route within the time parameters and that he did not make MSP scans, this Court cannot deduce a causal connection here. *Id.*

### 7.    Defendant's Legitimate Reasons/Pretext

Assuming, *arguendo*, that Plaintiff could establish a prima facie case of retaliation, Defendant has proffered legitimate, nondiscriminatory reasons for the above incidents.  The record is clear that Plaintiff: was insubordinate; made inappropriate statements; failed to submit appropriate paperwork or evidence to

23

substantiate his FMLA, clock ring, and overtime claims; took too long to complete his route; disrupted other employees; and failed to make MSP scans.  Plaintiff has put forth no evidence to show that these reasons were not anchored in fact, did not motivate Defendant's actions, or were insufficient to motivate Defendant's actions. *Harris*, 594 F.3d at 685.  He has also not shown that these reasons were actually false *and* that retaliation was the real reason for Defendant's actions.  *Hicks*, 509 U.S. at 515.

In sum, Defendant is entitled to Summary Judgment on Plaintiff's retaliation claim.[7]

---

[7] Though the USPS did not brief the issue, Federal Rule of Evidence 803(8)(c) permits this Court to consider ALJ Gendreau's factual findings for the purposes of summary judgment.  Under this rule, "[p]rior administrative findings made with respect to an employment discrimination claim may . . . be admitted as evidence at a federal-sector trial de novo" and therefore may be considered at the summary judgment stage.  *Alexander v. CareSource*, 576 F.3d 551, 562 (6th Cir. 2009) (citing *Chandler v. Roudebush*, 425 U.S. 840, 863 n. 39 (1976)).  This exception to the hearsay rule, however, does not apply if "there is an indication of lack of trustworthiness."  *Id.* at 563.  Here, ALJ Gendreau made factual findings that completely undermine Plaintiff's claim of retaliation.  For example, she did "not credit [Plaintiff]'s version and interpretation of" his March 10, 2009 interaction with Lewis because "it was [Plaintiff] who made an aggressive comment" and "it was clear that Lewis' [was] concern[ed] that [Plaintiff] was going into unauthorized overtime after not completing his route."  (Def's Ex. 11, Dkt. 15-12, at 38).  She made similar factual findings for all other acts of alleged retaliation, giving little to no credence to Plaintiff's testimony.  (*Id.* at 4-10, 37-47).  There is also no indication that ALJ Gendreau's determination lacked trustworthiness, especially because it was based upon two days of live testimony where Plaintiff presented evidence and cross-examined witnesses.  Her findings, therefore, further support this Court's conclusion that Plaintiff's retaliation claim fails.

## C.    Plaintiff's Other Claims

In addition to Plaintiff's retaliation claim, Plaintiff's Complaint makes several conclusory claims that are legally cognizable: wrongful termination, harassment, discrimination, unpaid wages, violation of FMLA related statutes, unfair labor practices, medical/disability discrimination, breach of contract, and intentional infliction of emotional distress.[8]    While *pro se* pleadings are held to "less stringent standards than formal pleadings drafted by lawyers," courts "need not accept as true legal conclusions or unwarranted factual inferences." *Montgomery v. Huntington Bank,* 346 F.3d 693, 698 (6th Cir. 2003).    All such allegations are conclusory, without factual support, and are therefore dismissed for failing to state a claim under Rule 12(b)(6).[9]

---

[8]   Intimidation, subjection to stress and duress, mental anguish, and financial destabilization are, on their own, not recognizable causes of action.

[9]   As Defendant points out, several of these claims are also barred on alternative grounds.    First, Plaintiff's intentional infliction of emotional distress claim fails because Plaintiff did not exhaust his administrative remedies pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675(a).    (Def's Ex. 17, Dkt. # 15-18).    Second, Plaintiff's breach of contract claim is premised on a violation of prior EEOC settlement agreements between the parties.    Plaintiff was required to notify the EEO Director, in writing, of the alleged noncompliance within 30 days of when he knew or should have known of the alleged noncompliance.    29 C.F.R. § 1614.504(a).    Because Plaintiff did not do so, this Court lacks subject-matter jurisdiction to hear that claim.    *Taylor v. Geithner*, 703 F.3d 328, 335 (6th Cir. 2013).    Third, this Court does not have subject-matter jurisdiction over Plaintiff's unfair labor practices claim -- the National Labor Relations Board has exclusive jurisdiction over all unfair labor practices.    *Martin v. Lake Cnty. Sewer Co.*, 269 F.3d 673, 680 (6th Cir. 2001).

## IV. CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant's Motion for Summary

Judgment is GRANTED and Plaintiff's Complaint is dismissed, with prejudice.

**IT IS SO ORDERED.**


Dated:  September 30, 2013            s/Gerald E. Rosen_____
                                     GERALD E. ROSEN
                                     CHIEF, U.S. DISTRICT COURT


I hereby certify that a copy of the foregoing document was mailed to the attorneys
of record on this date, September 30, 2013, by electronic and/or ordinary mail.

                                     s/Julie Owens_____
                                     Case Manager, 313-234-5135